PILGRIM'S PRIDE CORPORATION and Paul Dixon Link, Appellants

v.

William A. SMOAK, Appellee.

No. 06–03–00182–CV.

Court of Appeals of Texas, Texarkana.

Submitted April 22, 2004.

Decided May 19, 2004.

Rehearing Overruled June 8, 2004.

882

Levi G. McCathern, II, C. Brett Stecklein, McCathern Mooty Buffington, LLP, Dallas, Kevin C. Norton, Cantey & Hanger, LLP, Fort Worth, TX, for appellant.

Mark P. McMahon, Blake C. Erskine, Erskine & McMahon, LLP, Longview, TX, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice ROSS.

William A. Smoak was injured in a collision that occurred on Broadnax Street in Daingerfield. Smoak's pickup truck collided with a Pilgrim's Pride eighteen-wheel tractor-trailer rig driven by Paul Dixon Link. Smoak's evidence showed he was traveling westbound on Watson Boulevard, turning right onto Broadnax. The turn onto Broadnax is accomplished by taking a merge lane exit from Watson onto Broadnax. The merge lane from Watson continues independently on Broadnax. Link was traveling eastbound on Watson and turned left, also onto Broadnax. As he entered Broadnax, he immediately moved over into Smoak's right merge lane. When he did so, the eighteen-wheeler collided with Smoak's pickup truck.

Smoak suffered a back injury from the collision that eventually required surgery. He sued Pilgrim's Pride Corporation and Link for his injuries. The jury found Pilgrim's Pride and Link seventy-five percent at fault, and Smoak twenty-five percent at fault. The jury found $50,000.00 in damages for Smoak's past physical pain and mental anguish; $25,000.00 for future physical pain and mental anguish; $37,500.00 for past loss of earning capacity; $200,000.00 for future loss of earning capacity; $100,000.00 for past physical im-

pairment; and $100,000.00 for future physical impairment. The jury also found $91,103.93 in damages for past medical care and $25,000.00 for future medical care. The parties stipulated to $3,989.28 in property damage. The trial court took seventy-five percent of the damage award and added prejudgment interest, for a total damage award of $632,761.49.

Pilgrim's Pride and Link (collectively, Pilgrim's Pride) appeal, contending the investigating officer's testimony on causation, and Smoak's economic expert's testimony on loss of earning capacity, were no evidence, and the trial court erred in admitting their testimony. Pilgrim's Pride also contends there was no or insufficient evidence on causation, past and future lost earning capacity, or future medical care, to sustain a judgment.

## I. STANDARD OF REVIEW

### 1. Legal and Factual Sufficiency

In determining a legal sufficiency issue, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cazarez,* 937 S.W.2d at 450.

When deciding a legal sufficiency point, in determining whether there is no evidence of probative force to support a jury's finding, we must consider all the evidence in the record in the light most favorable to the party in whose favor the verdict has been rendered, and we must apply every reasonable inference that could be made from the evidence in that party's favor. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). In this review, we disregard all evidence and inferences to the contrary. *Burroughs Well-come Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990). A no-evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.,* 77 S.W.3d 253, 262 (Tex.2002). If we find some probative evidence, we will test the factual sufficiency of that evidence by examining the entire record to determine whether the finding is clearly wrong and unjust.

When considering a factual sufficiency challenge to a jury's verdict, courts of appeals must consider and weigh all the evidence, not just that evidence which supports the verdict. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). A court of appeals can set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Id.; Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). The court of appeals is not a fact-finder. Accordingly, the court of appeals may not pass on the witnesses' credibility or substitute its judgment for that of the fact-finder, even if the evidence would clearly support a different result. *Ellis,* 971 S.W.2d at 407; *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.). If we find the evidence insufficient, we must clearly state why the

jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986).

### 2. Negligence

▮▮▮ To prove negligence, the plaintiff must prove that a breach of a duty proximately caused that plaintiff's damages. *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). To establish causation in a personal injury suit, a plaintiff must prove that the defendant's conduct caused an event and that this event caused the plaintiff to suffer compensable injuries. *Crye*, 907 S.W.2d at 499; *Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 603 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

▮▮▮ Proximate cause consists of two elements: cause in fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995). Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury, which would not otherwise have occurred. *Id.* Cause in fact is not shown if the defendant's negligence did no more than furnish a condition that made the injury possible. *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 776 (Tex. 1995). The second element of proximate cause, foreseeability, requires that a person of ordinary intelligence should have anticipated the danger created by the negligent act or omission. *Doe*, 907 S.W.2d at 478. These elements cannot be established by mere conjecture, guess, or speculation. *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex.1980). However, like any other ultimate fact, proximate cause may be established by direct or circumstantial evidence and the reasonable inferences that may be drawn from that evidence. *Id.* at 903–04.

▮▮ The trier of fact is usually allowed to decide the issue of causation in cases: (1) when general experience and common sense will enable a layperson fairly to determine the causal relationship between the event and the condition; (2) when scientific principles, usually proven by expert testimony, establish a traceable chain of causation from the condition back to the event; or (3) when probable causal relationship is shown by expert testimony. *Lenger v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 706 (Tex.1970).

## II. INVESTIGATING OFFICER'S TESTIMONY

City policeman Ronald Penny, the investigating officer, testified he arrived at the scene a minute or two after the accident. On arriving, he interviewed Smoak and Link, as well as a witness to the accident, Peggy Bolton. Smoak told Penny the eighteen-wheeler had moved over into his lane as he was merging onto Broadnax. Link told Penny he did not see Smoak until after the accident happened. Bolton told Penny that Smoak attempted to "squeeze in" as the eighteen-wheeler changed lanes. Penny then examined skid marks on the street, which he determined were not braking skid marks, but marks from Smoak's truck as his tire locked when he collided with, and was subsequently dragged by, the eighteen-wheeler. Penny determined the point of impact from those marks to be in Smoak's merge lane, past the end of the median, requiring Link to have crossed a solid white line. After factoring in all those circumstances, Penny concluded Link caused the accident by his inattention in not seeing Smoak and by changing lanes when it was unsafe to do so.

Pilgrim's Pride contends Penny was not qualified to give an opinion regarding how the accident took place and who was at

fault. They argue that such testimony was highly prejudicial since Penny was a police officer and that, under TEX.R. EVID. 403, the unfair prejudice of his opinion outweighed its probative value.

### 1. Preservation of Error

■ Pilgrim's Pride failed to preserve error on their complaint regarding Penny's qualifications. To preserve an issue for appellate review, the record must demonstrate that (1) the complaint was made to the trial court by a timely request, objection, or motion, which stated the grounds of the objection with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context; and (2) the trial court ruled on the request, objection, or motion either explicitly or implicitly or refused to rule on the request, objection, or motion and the complaining party objected to the refusal. TEX.R.APP. P. 33.1(a). Pilgrim's Pride filed a motion to exclude Penny's testimony, but a ruling on that motion does not appear in the record.

■ Pilgrim's Pride did object at trial to Penny's testimony on several grounds, none of which were based on his qualifications for which they received an adverse ruling. Pilgrim's Pride objected to any reference in Penny's testimony that Link received a traffic citation. Pilgrim's Pride also objected at various times to the accident report prepared by Penny. They objected to any reference to a citation or to insurance in that report. The trial court sustained this objection and ordered those references redacted from the report. Counsel began, but did not pursue, an objection to the accident report, "subject to our prior objection regarding Officer Penny's qualifications to render the opinions regarding what caused the accident...." Link later "opened the door" during his testimony concerning the citation he received. Smoak then offered unredacted versions of Penny's report. Pilgrim's Pride objected, "just the same objection that we have had before on these documents,...." The court left out any references to insurance in the report, but allowed the references to the citation. Pilgrim's Pride failed to object and obtain an adverse ruling that Penny was not qualified to testify concerning negligence.[1]

1. We do address whether Penny's testimony was no evidence without requiring the objection to be preserved, because Penny testified he is not an expert on accident reconstruction and Smoak concedes he is not an expert. Pilgrim's Pride cites authority for the proposition that incompetent opinion testimony is no evidence even without a proper objection. *See Leitch v. Hornsby*, 935 S.W.2d 114, 119 (Tex.1996); *Mo. Pac. R.R. Co. v. Buenrostro*, 853 S.W.2d 66, 77 (Tex.App.-San Antonio 1993, writ denied). In regard to expert testimony, however, the Texas Supreme Court has held that "[t]o preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered." *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex.1998). An adverse ruling also appears to be required. *See* TEX.R.APP. P. 33.1(a)(2); *Kerr-McGee Corp. v. Helton*, No. 02-0356, 133 S.W.3d 245, 251, 2004 WL 224458, at *5 (Tex. Jan.30, 2004) (finding trial court's ruling on motion to strike expert's testimony after cross-examination was sufficient to preserve parties' no-evidence complaint). The determination of the qualifications of an expert, like the scientific methodology the expert uses, is part of the trial court's gatekeeping function. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex.1995) (gatekeeping function of trial court is to determine whether expert witness is qualified and to determine whether expert's testimony is both reliable and based on reliable foundation). But, see *Coastal Transport Company, Inc. v. Crown Central Petroleum Corp.*, No. 01-0301, 136 S.W.3d 227, 2004 WL 1091423, 2004 Tex. LEXIS 441 (Tex. May 14, 2004) where the Texas Supreme Court held that an objection is required only when a challenge to expert testimony questions the underlying methodol-

### 2. No Evidence

Pilgrim's Pride contends, nonetheless, that, because Penny was not qualified to give his opinion on whose negligence caused the accident, his conclusion that Link was the negligent party was no evidence to support a verdict and that, because it was no evidence, no objection was required.

■■■ Incompetent opinion testimony is not evidence, and a finding supported only by such testimony cannot survive a no-evidence challenge. *Leitch*, 935 S.W.2d at 119; *Mo. Pac. R.R. Co. v. Buenrostro*, 853 S.W.2d 66, 77 (Tex.App.-San Antonio 1993, writ denied) (finding testimony of conclusion that defendant had right to control plaintiff and thus had obligation to exercise care in his safety was no evidence, even though not objected to, because offered by unqualified witness); *Gannett Outdoor Co. v. Kubeczka*, 710 S.W.2d 79, 89 (Tex.App.-Houston [14th Dist.] 1986, no writ).

Texas Rule of Evidence 702 generally governs expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX.R. EVID. 702.

■■■ Smoak, who concedes Penny was not an expert on accident reconstruction, contends his testimony was evidence on negligence because it was lay opinion based on his own personal observations and experiences as a police officer. Smoak cites *Williams v. State*, 760 S.W.2d 292 (Tex.App.-Texarkana 1988, pet. ref'd), and

*Carter v. Steere Tank Lines, Inc.*, 835 S.W.2d 176 (Tex.App.-Amarillo 1992, writ denied). In *Williams*, 760 S.W.2d at 296, an officer testified to the common use of vise grips to assist in stealing cars. The court found his testimony was based on his personal observations and experiences as a police officer. *Id.* In *Carter*, 835 S.W.2d at 182, an officer attempted to testify on the proper method for turning left. The court found the officer's testimony was not testimony on scientific, technical, or other specialized knowledge, and the testimony could be given by a lay witness. *Id.* In this case, Penny based his opinion on witness testimony and physical evidence, such as skid marks and vehicle damage. He was not asked a general question on the proper method of changing lanes, but a specific question on whether Link's lane change was a cause of the accident. Such testimony on accident causation is required to be given by a qualified person in that science. *Gainsco County Mut. Ins. Co. v. Martinez*, 27 S.W.3d 97, 105 (Tex.App.-San Antonio 2000, pet. dism'd by agr.); *Chavers v. State*, 991 S.W.2d 457, 460–61 (Tex. App.-Houston [1st Dist.] 1999, pet. ref'd); *Trailways, Inc. v. Clark*, 794 S.W.2d 479, 483 (Tex.App.-Corpus Christi 1990, writ denied).

■■■ As a general rule, police officers, based on their position as police officers alone, are not qualified to render opinions regarding accidents. *Lopez v. S. Pac. Transp. Co.*, 847 S.W.2d 330, 334 (Tex.App.-El Paso 1993, no writ). However, police officers are qualified to testify regarding accident reconstruction if they are trained in the science and possess the high degree of knowledge sufficient to qualify as an expert. *Martinez*, 27 S.W.3d at 104–05; *Chavers*, 991 S.W.2d at 460–61; *Trailways, Inc.*, 794 S.W.2d at 483.

ogy, technique, or foundational data used by the witness.

No definite guidelines exist for determining whether a particular witness possesses the knowledge, skill, or expertise to qualify as an expert. *Rogers v. Gonzales*, 654 S.W.2d 509, 513 (Tex.App.-Corpus Christi 1983, writ ref'd n.r.e.). Case-law exists on both sides of this issue. *See, e.g., Trailways, Inc.*, 794 S.W.2d at 483 (officer allowed to testify regarding speed of bus and its contribution to cause of accident); *Rainbo Baking Co. v. Stafford*, 764 S.W.2d 379, 383 (Tex.App.-Beaumont 1989), *writ denied*, 787 S.W.2d 41 (Tex. 1990) (officer permitted to testify regarding cause of accident); *DeLeon v. Louder*, 743 S.W.2d 357, 359 (Tex.App.-Amarillo 1987), *writ denied*, 754 S.W.2d 148 (Tex. 1988) (officer held to be qualified to testify regarding cause of accident); *Rogers*, 654 S.W.2d at 513–14 (officer qualified to testify regarding speed based on skid marks). *But see, e.g., Lopez*, 847 S.W.2d at 335 (officer not qualified to testify regarding cause of accident where there was no showing of specialized knowledge in accident reconstruction); *St. Louis Southwestern Ry. Co. v. King*, 817 S.W.2d 760, 763 (Tex.App.-Texarkana 1991, no writ) (court did not abuse its discretion in excluding officer's testimony regarding cause of accident); *Hooper v. Torres*, 790 S.W.2d 757, 760–61 (Tex.App.-El Paso 1990, writ denied) (officer not qualified to testify as to cause of accident because he was not accident reconstructionist); *Bounds v. Scurlock Oil Co.*, 730 S.W.2d 68, 71 (Tex.App.-Corpus Christi 1987, writ ref'd n.r.e.) (officer not qualified to express opinion on cause of accident where he was not accident analyst or reconstruction expert).

In this case, Penny testified he was not qualified to give an expert opinion on accident reconstruction. He testified he had been a patrolman with the Daingerfield Police Department for one and one-half years. In his deposition testimony attached to Pilgrim's Pride's motion to exclude, he testified he graduated from Northeast Texas Community College Academy with a degree in applied science, not criminal justice. He took only one class on accident reconstruction, which was a one-week course for three hours a day. He received no other accident reconstruction training. He did not testify regarding the number of accidents he had investigated, but he stated he had worked fewer than ten accidents which involved the Watson–Broadnax intersection. *See Clark v. Cotten*, 573 S.W.2d 886, 887–88 (Tex.Civ. App.-Beaumont 1978, writ ref'd n.r.e.) (officer with eight and one-half years' experience and who had investigated over 350 accidents insufficient to qualify as expert when he had no specialized training in accident reconstruction).

Penny was not an accident reconstruction expert who had the experience and knowledge to observe the scene and add some scientific, technical, or specialized knowledge to the evidence which would assist the trier of fact to understand the evidence and testimony in the case. Penny, therefore, was not qualified to offer his opinion on whose negligence caused the accident, and his conclusion on who caused the accident did not assist the jury.[2]

2. Smoak contends that Penny's conclusions on causation were admitted without objection in his official police report and that his report was admissible under Tex.R. Evid. 803(8). However, based on Penny's lack of qualifications, his conclusions were equally inadmissible under Rule 803(8). The term "factual findings" in Rule 803(8)(C) includes opinions or conclusions of a factual nature, such as the cause of an accident. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988); *McRae v. Echols*, 8 S.W.3d 797, 800 (Tex.App.-Waco 2000, pet. denied) (officer's report containing opinions as to cause of accident); *Carter v. Steere Tank Lines, Inc.*, 835 S.W.2d 176, 181 (Tex.App.-

### 3. Expert Testimony Not Required

Penny's opinion on causation was not based on any scientific, technical, or other specialized knowledge not generally possessed by a layperson. Tex.R. Evid. 702 permits the testimony of an expert if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, . . . ." Penny's opinion as to the cause of the accident was not based solely on his direct observations of the accident scene, but also on his interviews of witnesses after the fact. His opinion that Link caused the accident by being inattentive and by unsafely changing lanes did not involve any specialized accident reconstruction expertise, but rather was based on Penny's interviews at the scene and from his observation that the skid marks began in Smoak's merge lane. The jury had the direct testimony of the witnesses to the accident, as well as photographs and diagrams of the scene, and was in as good a position as the officer to form an opinion as to the cause of the occurrence. *See Monsanto Co. v. Johnson*, 675 S.W.2d 305, 311 (Tex.App.-Houston [1st Dist.] 1984), *pets. ref'd [2 pets.]*, 696 S.W.2d 558 (Tex.1985) (officer not allowed to testify accident caused by driver's seizure or blackout because he was not specially qualified to give such opinion by any knowledge that was not generally possessed by layperson); *see also McMichen v. Moattar*, 221 Ga.App. 230, 470 S.E.2d 800, 801–02 (1996); *Breagy v. Stark*, 138 N.H. 479, 642 A.2d 329, 333 (1994) (finding officer's testimony on allocation of fault properly excluded because would not have assisted jury where jury had already heard from numerous fact witnesses, seen photographs, and heard officer's testimony about his observations); *Hatfield v. Andermatt*, 54 Ohio App.3d 188, 561 N.E.2d 1023, 1025–26 (1988).

 In this case, the determination of whose negligence caused the accident did not require the testimony of an expert. Expert testimony is necessary when the alleged negligence is of such a nature as not to be within the experience of the layperson. *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex.1982). Expert testimony is

Amarillo 1992, writ denied) (accident report was not properly excluded as hearsay because accident reports admissible under Rule 803(8) as exceptions to the hearsay rule).

The "provision for escape" is contained in the final clause of the Rule: evaluative reports are admissible "unless the sources of information or other circumstances indicate lack of trustworthiness." *Beech Aircraft Corp.*, 488 U.S. at 167, 109 S.Ct. 439. This trustworthiness inquiry is the primary safeguard against the admission of unreliable evidence, and it is important to note that it applies to all elements of the report. *Id.* Thus, a trial court has the discretion, and indeed the obligation, to exclude an entire report or portions thereof—whether narrow "factual" statements or broader "conclusions"—that the court determines untrustworthy. *Id.* The Advisory Committee on the Federal Rules of Evidence proposed a nonexclusive list of four factors it thought would be helpful in passing on this question: (1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation. *Id.* (citing Advisory Committee's Notes on Fed. Rule Evid. 803(8), 28 U.S.C.App., p. 725; see Note, The Trustworthiness of Government Evaluative Reports under Federal Rule of Evidence 803(8)(C), 96 Harv. L.Rev. 492 (1982)). As previously discussed, Penny was not qualified, and his skill and experience were insufficient to give an opinion on whose negligence caused the accident. *See Fraley v. Rockwell Int'l Corp.*, 470 F.Supp. 1264, 1267 (S.D.Ohio 1979) (report on causes of Navy airplane accident inadmissible because trial court found report untrustworthy because it "was prepared by an inexperienced investigator in a highly complex field of investigation"). For that reason, his conclusions on the cause of the accident were also inadmissible as exceptions to the hearsay rule under Rule 803(8).

generally necessary in medical malpractice cases and chemical exposure cases, in which medically complex diseases and causal ambiguities compound the need for expert testimony. *LeNotre v. Cohen,* 979 S.W.2d 723, 727–28 (Tex.App.-Houston [14th Dist.] 1998, pet. denied); *see also Hernandez v. Tex. Employers Ins. Ass'n,* 783 S.W.2d 250, 252–53 (Tex.App.-Corpus Christi 1989, no writ) (holding that expert testimony needed to determine cause of asthma, which had uncertain causal nature). Other claims also require expert testimony to assist the trier of fact. *See Turbines, Inc. v. Dardis,* 1 S.W.3d 726, 738 (Tex.App.-Amarillo 1999, pet. denied) (concluding negligence of aircraft turbine engine mechanic requires expert testimony because "performance of mechanical work on turbine aircraft engines is not within the experience of a layman"); *Hager v. Romines,* 913 S.W.2d 733, 734–35 (Tex. App.-Fort Worth 1995, no writ) (concluding aerial application of herbicide must be established by expert testimony because "[n]ot only is flying an airplane not within the realm of experience of the ordinary, prudent person or juror, ... applying herbicide and pesticide aerially requires use of specialized equipment and techniques that are not familiar to the ordinary person").

Pilgrim's Pride does not contend that there was insufficient evidence to establish that the accident caused Smoak's back injury and resulting surgery, only that there was no or insufficient evidence of whose negligence caused the accident. However, not every motor vehicle accident requires expert testimony to understand how it took place and who was at fault. This case does not involve complex accident reconstruction analysis in order to understand whose negligence caused the accident, and the jury had ample evidence from which to determine fault. This case involved a low-speed collision between two vehicles. Several fact witnesses testified regarding the circumstances that caused the accident, and the physical evidence in the form of skid marks and damage to the vehicles was not outside a layperson's common sense or understanding. This was not a case with an unknown origin or circumstances.

■ The parties were permitted to introduce qualified accident reconstruction experts to assist the jury in determining the cause of the accident, but they were not required to do so. The trier of fact is usually allowed to decide the issue of causation in cases when general experience and common sense will enable a layperson to fairly determine the causal relationship between the event and the condition. *Lenger,* 455 S.W.2d at 706. The question here was not a complex one and was not beyond the competence of the average juror. Therefore, expert testimony was not required to establish negligence.

■ There was legally and factually sufficient evidence to support the jury's verdict that Pilgrim's Pride and Link were seventy-five percent at fault for the accident. Penny's conclusion that Link's negligence caused the accident was no evidence, but his testimony concerning his observations during the investigation were admissible. Testimony by a lay witness is admissible if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Tex.R. Evid. 701. Penny testified regarding several observations he made during his investigation which were helpful to a clear understanding of who caused the accident. He testified the skid marks started in Smoak's merge lane. He also testified regarding the location of the two vehicles and the damage to each. He stated the front left of Smoak's vehicle was severely damaged and was stuck to the back tandem wheels of the eighteen-wheel-

er. Penny also testified regarding the weather conditions at the time of the collision, the configuration of the Watson–Broadnax intersection, and the lack of a yield sign in Smoak's merge lane onto Broadnax. All these observations were admissible as rationally based on Penny's perception and were helpful to the determination of who caused the accident.

In addition, Smoak testified that the eighteen-wheeler was in the intersection when he began to merge onto Broadnax and that, as he proceeded in the merge lane, he was struck immediately after he passed the concrete median. He testified that he was struck in his lane and that Link had to cross a double white stripe to hit him at that point. Link admitted the wreck could have been his fault and volunteered that the police officer had issued him a traffic citation. He testified that, when he entered the intersection, he looked to the right, but did not see anyone coming. He testified he started to proceed into the right merge lane of Broadnax to get out of the way of faster traffic, and that is when the impact occurred. He testified he never saw Smoak until after the accident.

The evidence Link was not negligent includes the testimony of Bolton. It is unclear from her testimony exactly where she was located when she observed the accident, but she testified Smoak passed her and tried to get to the right of the eighteen-wheeler, but collided with its back end. This testimony suggests that Smoak's inattention contributed to the accident, and the jury did in fact determine that Smoak was twenty-five percent at fault.

We do not pass on the credibility of the witnesses, and we do not substitute our opinion for the trier of fact, even if there is conflicting evidence on which a different conclusion could be supported. *Clancy,*

705 S.W.2d at 826. There is evidence Link negligently caused the accident, and the verdict is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

## III. EQUAL INFERENCE RULE

Pilgrim's Pride also attacks the jury's findings on the basis that the conflicting inferences that may be drawn from the circumstantial evidence in this case are equally probative of different occurrences. Pilgrim's Pride contends that, in such a situation, the equal inference rule requires that all inferences be disregarded. This is a mischaracterization of the equal inference rule. That rule applies only where the circumstantial evidence supporting the inferences is so slight that any plausible inference is only a guess, and thus amounts to no evidence at all. If circumstantial evidence will support more than one reasonable inference, as in this case, it is for the trier of fact to decide which is more reasonable, subject only to a factual sufficiency review. *See Morton Int'l v. Gillespie,* 39 S.W.3d 651, 658 (Tex. App.-Texarkana 2001, pet. denied); *Purina Mills, Inc. v. Odell,* 948 S.W.2d 927, 936 (Tex.App.-Texarkana 1997, writ denied) ("Disputed facts may be established by circumstantial or direct evidence. Absolute certainty is not required. Nor must the plaintiff exclude every other possibility. All that is required before there can be a finding of ultimate fact is proof of a causal connection beyond the point of conjecture or mere possibility." (Citations omitted.)). It was for the jury in this case to decide which inference was more reasonable, and its verdict was not so against the great weight and preponderance of the evidence as to be manifestly unjust.

## IV. ECONOMIC EXPERT'S TESTIMONY

Pilgrim's Pride contends that Dale Funderburk, Smoak's economic expert, was

not a qualified vocational expert or employment specialist and that his methodology was flawed. Therefore, according to Pilgrim's Pride, the trial court abused its discretion in permitting him to testify and his testimony was no evidence on past or future lost earnings. Pilgrim's Pride also contends Funderburk's testimony was improperly allowed after he materially changed his opinion and deviated from his own methodology and assumptions the day before trial, without giving the proper thirty-day pretrial disclosure.

Funderburk testified to the loss of earning capacity Smoak suffered as a result of a back injury he sustained in the accident. He testified he arrived at loss of earning capacity by comparing two streams of income. He compared what a person will be able to earn, given such person's injuries, to what that person would have been able to earn over his or her work life had such person not been injured. He stated that earning capacity at the time of injury is usually what a person is earning at the time of injury. In cases such as Smoak's, his actual earnings at the time of the accident did not represent his earning capacity because he was involved in starting agricultural endeavors, such as timber, hay baling, farming, and cattle raising. Funderburk testified these endeavors produced a low and erratic stream of income, but there were times before the accident when Smoak worked as a welder. Smoak indicated to Funderburk that, after the accident, he made $17.00/hour as a welder. Funderburk looked at the $17.00/hour figure and compared it with figures put out by the U.S. Department of Labor. He determined construction workers made that much or more. Funderburk then used that $17.00/hour welding job, annualized to $35,000.00/year as Smoak's earning capacity at the time of the accident. He used the $17.00/hour welding job as the basis of Smoak's earning capacity because

Smoak had the ability and option to perform that work before the accident.

Smoak indicated to Funderburk that, after the accident, he was no longer physically able to work as a welder. So, in his preliminary report, Funderburk used zero as Smoak's residual ability to work after the accident. After the preliminary report, but before trial, Smoak indicated to Funderburk he was able to work, with the assistance of helpers, in the agricultural ventures. Funderburk then determined Smoak could earn between $12,000.00–$25,0000.00/year in those ventures.

Funderburk took those two incomes, calculated a stream of earning capacity to the expected work-life expectancy for each, compounded those incomes, and discounted them to present value. He subtracted Smoak's income stream, had he not been injured, to his projected income with the limitations from the injury. He used two possible work-life expectancies and gave both figures to the jury. He determined that, if Smoak worked to age 60.2, the loss of future earnings after the accident would be $254,000.00, based on earnings of $25,000.00/year in his agricultural ventures. He calculated Smoak's future earnings would be $572,720.00, based on earnings of $12,000.00/year post-accident. Funderburk determined that, if Smoak worked to age 67, the loss of future earnings would be $312,704.00, based on earnings of $25,000.00/year post-accident, and $705,094.00, based on earnings of $12,000.00 post-accident. The jury found $200,000.00 as the loss of future earning capacity.

### 1. Preservation of Error

■ Pilgrim's Pride did not preserve error in their objection that Funderburk was unqualified or relied on unsound methodology. Pilgrim's Pride filed a motion before trial to exclude Funderburk's testimony. However, Pilgrim's Pride was re-

quired to obtain an adverse ruling on their objection to preserve error for review. *See* Tex.R.App. P. 33.1(a)(2); *Kerr–McGee Corp. v. Helton,* No. 02–0356, 133 S.W.3d 245, 251, 2004 WL 224458, at *5 (Tex. Jan. 30, 2004) (finding that trial court's ruling on motion to strike expert's testimony after cross-examination was sufficient to preserve the parties' no-evidence complaint); *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet,* 61 S.W.3d 599, 613 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (finding that complaining party had to obtain ruling on their objection to admissibility and reliability of expert testimony before trial or when evidence was offered to preserve error).

 We are unable to locate anywhere in the record a ruling on Pilgrim's Pride's motion, and Pilgrim's Pride does not direct us to one. Pilgrim's Pride did object at trial to Funderburk's testimony: "for all the reasons we have on file already with the Court and the fact that we have a report here that he knows he's not going to testify about anything in it. He's not supplemented and we object to this witness being allowed to testify at all." Following this objection, Smoak's counsel began arguing Funderburk's qualifications and methodologies. The trial court stated: "I think his objection goes to failure to supplement." Pilgrim's Pride's counsel affirmed, "That's right." Counsel for both sides then argued to the trial court on the

failure to supplement. The trial court ultimately determined Smoak did not have a duty to supplement and overruled Pilgrim's Pride's objection. The affirmation by Pilgrim's Pride's counsel that their objection was for failure to supplement, together with the argument and ultimate adverse ruling of the trial court following that objection, make clear that Pilgrim's Pride's trial objection did not preserve error for their contention on appeal that Funderburk was unqualified or relied on unsound methodology. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. *See* Tex.R.App. P. 33.1(a); *see also* Tex.R. Evid. 103(a)(1). If a party fails to do this, error is not preserved, and the complaint is waived. *See Bushell v. Dean,* 803 S.W.2d 711, 712 (Tex.1991). In addition, an adverse ruling must be obtained from the trial court, either expressly or implicitly. Tex.R.App. P. 33.1(a)(2). Pilgrim's Pride affirmed to the trial court that their objection was for failure to supplement discovery, and they failed to obtain an adverse ruling, either expressly or implicitly, on any objection to Funderburk's qualifications or methodology. Pilgrim's Pride therefore failed to preserve error on their objections to Funderburk's qualifications and methodology.[3] Their objection for

---

3. In any event, Funderburk was properly qualified and his testimony was not based on unsound methodology. He testified he is a full professor of economics at Texas A & M University at Commerce. He testified he has been a full professor for ten or twelve years and has been tenured for twenty years. He testified he arrived at the loss of Smoak's earning capacity from the injury by subtracting potential annual earning capacity absent injury from post-accident earnings. He then multiplied by Smoak's work-life expectancy, discounted to present value.

As the court in *Miller v. Burlington N. Santa Fe Ry.,* No. 7:99–CV–0149–R, 2001 WL 1326552, at *3, 2001 U.S. Dist. LEXIS 16650, at *8–9 (N. Dist.Tex. Oct. 16, 2001) (not designated for publication), stated, the knowledge and skills used by an economic expert in assembling and compiling data on loss of earnings, performing mathematical calculations, selecting the formulae (functions) to be applied to the data, charting the results, and then summarizing the end figures in mathematical and written language do not require

failing to supplement, however, was clearly preserved.

## 2. No Evidence

Pilgrim's Pride argues, nonetheless, that Funderburk's opinions constituted no evidence, and as such, no ruling on their objection was required. The Texas Supreme Court has recently held that when a challenge to an expert witness' opinions is restricted to the face of the record, then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility. *Coastal Transport Company, Inc. v. Crown Central Petroleum Corp.*, No. 01–0301, 136 S.W.3d 227, 2004 WL 1091423, 2004 Tex. LEXIS 441 (Tex. May 14, 2004). However, when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis. *Id.*

There are other rare cases when an expert's testimony, offered without objection or a ruling, can be regarded on appeal as no evidence. This arises where the assumptions or facts on which the expert expressly bases his or her opinion are unproven or shown to be undisputedly wrong.

In *Crye*, 907 S.W.2d at 499, the plaintiff's expert testified a Polysporin spray caused the plaintiff to suffer from frostbite. He based that opinion on the assumption there was no redness on the plaintiff's foot after the spray was applied. *Id.* The expert testified that, if the plaintiff's foot was red after the spray was applied, his diagnosis would have been different. *Id.* The plaintiff testified in a deposition, and her husband testified at trial, that her foot was red after the spray was applied, and no evidence was offered to the contrary. *Id.* The *Burroughs* court found that the expert's testimony constituted no evidence the Polysporin spray caused the plaintiff's frostbite, because it was based on assumed facts which varied materially from the actual, undisputed facts. *Id.*

In *Schaefer v. Tex. Employers' Ins. Ass'n*, 612 S.W.2d 199, 202–04 (Tex.1980), an expert testified that, in his opinion, Schaefer's disease resulted from his employment. The expert based his opinion on his assumptions that Schaefer had contracted the avian form of a certain disease, that the pathogen causing the disease was present in bird droppings at Schaefer's workplace, and that Schaefer had contracted the disease from the bird droppings. *Id.* No evidence was introduced to show that Schaefer had the avian form of the disease. *Id.* at 204. No evidence was introduced to show that bird droppings at Schaefer's workplace were infected with the pathogen. *Id.* Likewise, no evidence was introduced to show how Schaefer contracted the disease. *Id.* Based on that record, the court held the expert's opinion was no evidence because it was founded on mere possibility, speculation, and surmise. *Id.* at 204–05.

In this case, Pilgrim Pride's challenge to Funderburk's testimony clearly requires the court to evaluate the underlying methodology or foundational data used by him in forming his opinions. As such,

---

special college degrees or post-graduate education. The methodology is not a proper subject of peer review. *Id.* The bachelor's degree in economics which an economist holds reflects the degree of mastery of basic mathematical, statistical, and language skills necessary to perform the compilations, calculations, and formulae selections used by him or her in the analysis and in making the report. *Id.* Funderburk was, therefore, sufficiently qualified to give his expert opinion on Smoak's past and future lost earnings capacity, and his testimony was based on a reliable methodology.

Pilgrim's Pride was required to properly object to his expert opinions and obtain an adverse ruling, which they failed to do. Further, the record does not support a conclusion that Funderburk's testimony varied materially from undisputed facts, as in *Burroughs,* or that it constitutes nothing more than "mere possibility, speculation, and surmise," as in *Schaefer.*

A review of the record shows that Funderburk relied on the following evidence and assumptions for his opinions: (1) a projected work-life expectancy of 60.2 or 67 years based on U.S. Department of Labor figures; (2) a net discount rate of .006, as the difference between inflation and wage increases over the past 34 years, based on the Department of Labor statistics; (3) $35,000.00/year as pre-accident earning capacity, based on a $17.00/hour welding job; and (4) $12,000.00–$25,000.00/year as post-accident earning capacity, based on Smoak's agricultural ventures.

The figures obtained from the U.S. Department of Labor in regard to the net discount rate and work-life expectancy were never questioned. Pilgrim's Pride's main contention regarding Funderburk's testimony is that his use of the above figures in calculating Smoak's pre-accident and post-accident earning capacity was based on flawed, inconsistent, inaccurate, and irrelevant assumptions and methodology. From a review of the evidence, none of his assumptions were unproven or shown to be undisputedly wrong. Testimony from Smoak, along with his tax returns, showed that he was able to work as a welder before the accident at $17.00/hour and that, in a good year, he could potentially earn $12,000.00 to $25,000.00/year in his agricultural ventures after the accident. Pilgrim's Pride attempted to discredit Funderburk's testimony, but they failed to show the testimony was undisput-

edly wrong or based on mere speculation or conjecture.

Pilgrim's Pride contends Funderburk erred in using a job at which Smoak worked for only six to seven weeks after the accident to calculate pre-injury earning capacity. Pilgrim's Pride contends Smoak never had an hourly job that he held consistently for a year and that, before the accident, he mainly worked as a self-employed independent contractor, doing various kinds of seasonal work. Pilgrim's Pride contends the evidence shows that Smoak earned little to no money on agricultural and seasonal jobs before the injury, and actually earned more money ($17.00/hour) after the accident. Pilgrim's Pride concludes that Funderburk's testimony was based on erroneous and inaccurate data and was, therefore, no evidence.

 Proof of loss of earning capacity is always uncertain and must be left largely to the discretion of the jury. *McIver v. Gloria,* 140 Tex. 566, 169 S.W.2d 710, 712 (1943). Earning capacity has been defined as the "ability and fitness to work in gainful employment for any type of remuneration, including salary, commissions, and other benefits, whether or not the person is actually employed." *Baccus v. Am. States Ins. Co.,* 865 S.W.2d 587, 588 (Tex.App.-Fort Worth 1993, no writ); *Home Indem. Co. v. Eason,* 635 S.W.2d 593, 594 (Tex.App.-Houston [14th Dist.] 1982, no writ). It does not necessarily mean actual wages, income, or other benefits received during the period inquired about. *Baccus,* 865 S.W.2d at 588; *Eason,* 635 S.W.2d at 594–95. Factors such as stamina, efficiency, ability to work with pain, and the weakness and degenerative changes which naturally result from an injury and from long-suffered pain are legitimate considerations in determining whether a person has experienced an impairment in future earning capacity. Re-

duction in actual earnings is the best way to show a reduction in earning capacity. *Springer v. Baggs*, 500 S.W.2d 541, 544–45 (Tex.Civ.App.-Texarkana 1973, writ ref'd n.r.e.).

▪ Our courts have, however, consistently upheld judgments for reduced earning capacity, even though the plaintiff was making as much or even more money after the injury than before, where it was shown that pain, weakness, diminished functional ability, or the like indicated that the plaintiff's capacity to get and hold a job, or his or her capacity for duration, consistency, or efficiency of work, was impaired. *Id.* Therefore, the fact that Smoak's actual wages increased for a period of time after surgery does not make Funderburk's assumptions incorrect.

▪ Pilgrim's Pride focuses on Funderburk's reliance on a welding job to establish earning capacity when Smoak never worked a continuous year in that occupation before the injury. Loss of earning capacity, however, is not measured by what a person actually earned before injury, but what the worker's *capacity* to earn a livelihood actually was, even if he or she had never worked in that capacity in the past. *See McIver*, 169 S.W.2d at 712 (jury must determine value of minor's loss of earning capacity from its common knowledge and sense of justice); *Crown Plumbing, Inc. v. Petrozak*, 751 S.W.2d 936, 938 (Tex.App.-Houston [14th Dist.] 1988, writ denied); *Trailways, Inc. v. Mendoza*, 745 S.W.2d 63, 69 (Tex.App.-San Antonio 1987, no writ). In order to recover for diminished earning capacity in a particular occupation, it is not always necessary for the plaintiff to have been working in and deriving earnings from that occupation before injury, as long as earnings from that occupation would provide a true measure of that plaintiff's earning capacity.

In *King v. Skelly*, 452 S.W.2d 691 (Tex. 1970), the plaintiff was permitted to show his pre-injury earning capacity through testimony regarding what he could have earned pre-accident without the limitations of the injury. Before his injury, the plaintiff had been engaged in a variety of jobs, but at the time of his injury he was in business for himself as a contractor; with his own equipment, and with the aid of three or four employees, his principle employment was repairing and laying pipelines. *Id.* at 692. Although there was no evidence of the plaintiff's prior earnings, he did testify that, before sustaining the injury, he could have had a job as a pipeline welder and such welders made $14,000.00 to $17,000.00 per year; he also testified that, before the trial, but after being injured, he worked three weeks as a pipeline inspector, but driving from site to site caused him too much pain. *Id.* at 693. He testified pipeline inspectors earn $650.00 per month. *Id.* The court held it would not limit proof of earning capacity merely to evidence of his prior earnings; instead, evidence of a monetary measure of earning capacity before the injury is sufficient. *Id.* The plaintiff's testimony showed he could, by performing the same tasks in the employ of another which he performed while self-employed, earn from $14,000.00 to $17,000.00 per year. *Id.* at 694. The court found such evidence was a sufficient monetary measure of earning capacity before the date of injury. *Id.*

▪ In this case, Funderburk's reliance on Smoak's ability to perform a $17.00/hour welding job before the accident was not an erroneous monetary measure of earning capacity. Smoak indicated to Funderburk he was able to perform welding jobs before the accident, but unable to do so after the accident. Funderburk used the wage Smoak earned for six weeks as a welder after the accident as an

indicator of what Smoak could have earned before the accident as a welder. He then compared that figure to U.S. Department of Labor figures on what construction workers make and determined that figure was accurate.

Smoak testified that before the accident he worked in cycles. He testified he would bale hay, log, and raise cattle, during their respective seasons, but when he could not go out in the field, or during the winter months, he worked as a welder. He testified he worked as a welder in 1995, 1996, 1997, and 1998 (the year the wreck occurred). He testified concerning his income tax returns for those years and explained how his agricultural ventures posted erratic profits, but he would end up profitable every year through his welding jobs.[4] Smoak therefore had the capacity to work as a welder before the accident. Funderburk's use of that occupation to determine Smoak's earning capacity before the accident was not erroneous.

Smoak testified that after the accident he tried to work as a welder, but was unable to do the bending and stooping required to perform the work. He then had back surgery, which improved his condition. He testified that, even after the surgery, he could not take the day-in, day-out standing on the concrete required to perform the welding.

There was also testimony supporting Funderburk's assumption Smoak could earn between $12,000.00 and $25,000.00 after the accident in his agricultural ventures. Smoak testified that after the surgery in 2001 he began his logging business again, and he had hauled a few logs with his pickup truck and tractor. He testified that in a good year he felt he could make between $12,000.00 to $25,000.00 in that capacity. Pilgrim's Pride offered no evidence to refute this testimony. Smoak's income tax returns show he was capable of earning that much in the logging business.[5] For these reasons, we cannot say Funderburk's opinions were not supported by the record.

Pilgrim's Pride challenged Smoak's inability to work after the accident, but they did not prove that the assumptions on which Funderburk based his opinions were undisputedly wrong or erroneous. Pilgrim's Pride pointed out that Smoak's back surgery had substantially improved his condition and that he reported to his doctor at one checkup he had zero pain. Smoak testified he was better after the surgery, but he was not "fixed." He testified he was at a point where the pain was liveable as long as he did not "over exceed [his] activities." Smoak further testified that on good days he has zero pain, but some days, the pain is so great he has difficulty getting out of bed.

4. He testified concerning his income tax returns for those years as follows: In 1995, he posted a loss from his hay baling business, but a total income of $17,280.52, after factoring in his welding jobs. In 1996, he had a $701.00 profit from his hay baling business and a loss from cattle, but a total income of $18,802.00, after factoring in his welding employment. In 1997, he posted an $11,800.00 loss from his cattle operation, but ended up with an income of $14,000.00 after factoring in his welding. In 1998, the year of the accident, he worked in hay baling, cattle, and welding, and had a total income of $5,573.00.

The accident occurred in November, and he did not work from November 1998 to March 1999.

5. In 1992, he had a $28,078.00 gross income from logging, with a total profit of $7,369.33. In 1993, he had a $14,488.80 gross income from logging, with a total profit of $7,915.08. In 1994, he had a gross income of $35,254.51 from logging, with a total profit of $7,739.10. Post-accident in 2001, he had a gross income of $3,018.00 from logging, with a total loss of $140.00.

Funderburk's testimony did not vary materially from undisputed facts, as in *Burroughs*, or constitute nothing more than "mere possibility, speculation, and surmise," as in *Schaefer*. *See also Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 591 (Tex.1999). A review of the record shows that Funderburk relied on facts and assumptions supported by the record and allowed by law.

### 3. Failure to Supplement

Pilgrim's Pride also challenges Funderburk's testimony based on the contention he changed methodologies at trial, but Smoak did not supplement discovery as required. Pilgrim's Pride complains that before trial Funderburk assumed Smoak was unable to work after the accident, but changed his position shortly before trial and determined Smoak could work in his agricultural pursuits earning between $12,000.00 and $25,000.00 a year.

When a party fails to supplement a discovery response in a timely manner, the evidence may be excluded. Tex.R. Civ. P. 193.6(a); *see also Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 914 (Tex.1992). The remedy is mandatory and automatic unless the court finds there was good cause for the failure to amend or supplement, or the failure will not unfairly surprise or prejudice the other party. Tex.R. Civ. P. 193.6(a); *Morrow v. H.E.B., Inc.*, 714 S.W.2d 297, 297–98 (Tex.1986). The burden of establishing good cause or lack of unfair surprise is on the party seeking to introduce the evidence. Tex.R. Civ. P. 193.6(b). The trial court has discretion to determine whether the offering party has met its burden of showing good cause. *Aluminum Co. of Am. v. Bullock*, 870 S.W.2d 2, 3 (Tex.1994). The record must support a finding of good cause or lack of unfair surprise. Tex.R. Civ. P. 193.6(b).

In some instances, the change in an expert's opinion does not require supplementation. For example, an expert may refine calculations or perfect a report through the time of trial. *Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 304 (Tex.1993). An expert may also change an opinion without supplementation if the opinion is an "expansion on an already disclosed subject." *Navistar Int'l Transp. Corp. v. Crim Truck & Tractor Co.*, 883 S.W.2d 687, 691 (Tex.App.-Texarkana 1994, writ denied). However, a party may not present a material alteration of an expert's opinion at trial that would constitute a surprise attack. *See W. Tex. Gathering Co.*, 868 S.W.2d at 305. The purpose of requiring timely disclosure of a material change in an expert's opinion is to give the other party an opportunity to prepare a rebuttal. *See id.* at 304.

First, if there is a duty to supplement deposition testimony, *see Navistar Int'l Transp. Corp.*, 883 S.W.2d at 691, the change here was not a material change to Funderburk's methodology, as Pilgrim's Pride suggests. Funderburk used the same mathematical calculations and methods to arrive at future loss of earning capacity pretrial as he did at trial. The only difference was a change to the post-accident wages variable. This falls somewhere between a refinement in calculations, *see W. Tex. Gathering Co.*, 868 S.W.2d at 304, and an expansion of an already disclosed subject, *see Navistar Int'l Transp. Corp.*, 883 S.W.2d at 691, both of which are admissible without the need for supplementation. Second, the record shows Pilgrim's Pride was aware of the change before trial and therefore was not unfairly surprised or prejudiced by the change. Pilgrim's Pride's counsel indicated at trial that he was aware of Funderburk's change from the pretrial conference and that his objection was more to the

failure to receive written supplementation of that change. Under these facts, Pilgrim's Pride was not denied an opportunity to prepare a rebuttal. The change in Funderburk's calculation which increased Smoak's post-accident earning capacity from zero to between $12,000.00 and $25,000.00, thereby reducing Smoak's claim for future loss of earning capacity, actually benefited Pilgrim's Pride. For these reasons, the trial court did not abuse its discretion by permitting Funderburk to testify.

## V. NO OR INSUFFICIENT EVIDENCE ON PAST OR FUTURE LOSS OF EARNING CAPACITY OR FUTURE MEDICAL CARE

Pilgrim's Pride contends there is no or insufficient evidence of loss of earning capacity, both past and future, and no or insufficient evidence of future medical care. The standards of review for legal and factual sufficiency challenges were previously set out in our discussion of causation.

### 1. Past and Future Lost Earning Capacity

 Likewise, we previously discussed earning capacity and how it is not necessarily the same as reduced earnings. *See Springer*, 500 S.W.2d at 544–45. The amount recoverable for loss of earning capacity is the difference between the amount of money the plaintiff was capable of earning before the injury and the amount the plaintiff is capable of earning after the injury. *See Mikell v. La Beth*, 344 S.W.2d 702, 707 (Tex.Civ.App.-Houston 1961, writ ref'd n.r.e.). To recover damages for diminished earning capacity, the plaintiff must demonstrate (1) the existence, i.e., the fact, of an impairment, and (2) the extent of the loss resulting from the impairment. *See Wilkins v. Royal Indem. Co.*, 592 S.W.2d 64, 67–68 (Tex.Civ.App.-

Tyler 1979, no writ); *Springer*, 500 S.W.2d at 544–45 (Tex.Civ.App.-Texarkana 1973, writ ref'd n.r.e.).

Regarding loss of future earning capacity, the Texas Supreme Court has set out the evidence necessary to sustain a judgment as follows:

In a personal injury suit the amount which the plaintiff might have earned in the future is always uncertain, and must be left largely to the sound judgment and discretion of the jury. However, the verdict must be based on something more than mere conjecture. It must be an intelligent judgment, based upon such facts as are available. Even where the injury is of such a serious and permanent nature that loss of earning capacity is the necessary result, proof is required to show the extent and amount of the damages. No general rule can be laid down, except that each case must be judged upon its peculiar facts, and the damages proved with that degree of certainty of which the case is susceptible. Under this rule the required certainty of the proof will necessarily vary. Where plaintiff is a child, who has never earned any money, the jury must determine the value of its lost earning capacity altogether from their common knowledge and sense of justice. Likewise, where plaintiff is a housewife, the actual money value of her services need not be proved. On the other hand, where plaintiff is employed at a fixed wage or salary, the amount of his previous earnings ordinarily must be shown. And where plaintiff seeks special damages for loss of his earning capacity in a particular business or profession, the amount of his earnings or the value of his services in that business must be shown with reasonable certainty. The certainty of the proof required is also affected by the nature of plaintiff's injuries. If plain-

tiff's earning capacity is not totally destroyed, but only impaired, the extent of his loss can best be shown by comparing his actual earnings before and after his injury.

*McIver*, 169 S.W.2d at 712 (citations omitted).

In this case, the jury awarded $37,500.00 for past loss of earning capacity and $200,000.00 for future loss of earning capacity.

■ Evidence concerning the medical procedures made necessary by Smoak's injury, as well as the pain he suffered, establish his impairment and diminished ability to work after the accident until the time of trial. Smoak testified that, after the accident, his back injury caused severe pain which radiated into his right leg, causing numbness and tingling into his toes. The accident occurred in November 1998, and he attempted to work for the first time in March 1999. He testified he attempted to work at various jobs, including welding, but could not endure the severe lower back pain or the bending and stooping required. He also attempted to bale hay, but was unable to do so. He hired several people to run his hay baling operation, but sustained losses in that business until the bank foreclosed on the equipment.

He testified that in August 1999 he underwent intradiskal electrothermal therapy (IDET), which required him to wear a brace and stay inactive for six weeks. The procedure, however, did not control the pain in his back. He did not attempt to work again until January 2000. In October 2000, he was hospitalized for back spasms. In February 2001, he underwent spinal fusion surgery on his back. He testified the surgery was not a complete cure, but did improve his condition. He testified the pain was within toleration after the surgery, but he could still not take the day-in, day-out activities required to perform a welding job. Smoak testified he tried to do various jobs after the surgery, but he was limited, and if he tried to do too much, he would "pay the price for it."

Further, the jury was not left to mere conjecture in determining the extent of Smoak's loss from the time of the accident to the time of trial. Funderburk testified Smoak had the capacity to earn $35,000.00 a year as a welder before the accident. As previously discussed, this provided the jury with a reasonable monetary measure of Smoak's earning capacity before trial. *See King*, 452 S.W.2d at 692–93; *Petrozak*, 751 S.W.2d at 938. Smoak testified that, as a result of his injuries, he was unable to sustain a welding job because of the pain. The accident occurred in November 1998, and the trial took place in September 2002. His income tax returns for those years reflect a range in income that included a loss of $7,566.03 in 1999 and a profit of $10,003.20 in 2000. Funderburk and Smoak testified he had the capacity to earn between $12,000.00 and $25,000.00 in his agricultural ventures after the accident. The difference between what he could have made before the accident as a welder and what his capacity to earn after the accident in his agricultural ventures was $10,000.00. This sum, multiplied by the four years from the accident to the date of trial, yields a loss of past earning capacity of $40,000.00. The jury's verdict of $37,500.00 was reasonable and based on legally and factually sufficient evidence.

The jury returned a verdict of $200,000.00 for loss of future earning capacity. As just outlined, Smoak testified to the fact of impairment. The jury was not left to mere conjecture on the measure of loss of future earning capacity, because Funderburk again provided a specific valuation. Funderburk provided the jury with a range from $254,000.00 to $705,094.00 as

the loss of future earning capacity Smoak is likely to suffer from the accident. The jury's verdict of $200,000.00 was not unreasonable, or so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

Pilgrim's Pride contends certain evidence negates a recovery for loss of earning capacity. Pilgrim's Pride points out Smoak underwent a physical examination by his employer five to six months after the accident and was cleared to work. Smoak testified that he was not examined by a doctor and that the examination was very brief. Pilgrim's Pride also points out Smoak did not disclose to employers any physical limitations related to his back. Smoak testified he lied on the applications to obtain employment. Finally, Pilgrim's Pride points out Smoak was granted work-release by his surgeon, with "no work restrictions." Smoak testified that he tried many jobs after the surgery, but determined that the pain was too great to perform some of them, including welding. Smoak's surgeon testified the surgery was a success, but noted that after surgery "our bodies are never the same." Smoak's general physician testified he would put Smoak on a fifty-pound lifting limitation.

We do not pass on the credibility of the witnesses, and we do not substitute our opinion for that of the trier of fact, even if there is conflicting evidence on which a different conclusion could be supported. *Clancy,* 705 S.W.2d at 826. There is evidence Smoak has diminished earning capacity even after his surgery, and the verdict is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

### 2. Future Medical Care

Pilgrim's Pride also contends there is no or insufficient evidence to sustain the jury's award of $25,000.00 for future medical care.

Recovery for future medical expenses requires a showing there is a reasonable probability such medical expenses will be incurred in the future. *Fibreboard Corp. v. Pool,* 813 S.W.2d 658, 681 (Tex.App.-Texarkana 1991, writ denied). Likelihood and probability are synonymous. *Id.* The word probable conveys a meaning of more likely than not. *Id.* Quantifying probability, it means a more than fifty percent chance. *Id.* The plaintiff must also show the reasonable cost of the probable future medical care. *Rosenboom Mach. & Tool, Inc. v. Machala,* 995 S.W.2d 817, 828 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). The jury can determine the amount of probable future medical expenses based on the nature and course of the injuries or disability, the medical care rendered before trial, past medical expenses, and the condition of the injured party at the time of trial. *Id.* The plaintiff is not required to establish the future medical consequences of his or her injury by expert medical testimony grounded only on reasonable medical probability. *Dougherty v. Gifford,* 826 S.W.2d 668, 680 (Tex.App.-Texarkana 1992, no writ).

The testimony on future medical expenses was as follows. Smoak testified further treatment was a possibility, "[y]ou don't really know, you know, once the hardware wears out or if the bone graft doesn't go—you know, you don't really never know." Guy Danielson, III, M.D., Smoak's surgeon, testified that more likely than not the hardware inside Smoak's back will stay there for the rest of his life. He testified future problems for Smoak likely include "additional stress . . . on some of the other places in the spine above and below where the fusion is done," and a "likelihood that he [will] develop . . . ar-

thritic changes in that area earlier than would be expected."

This testimony does not show a reasonable probability of medical expenses in the future. There was no testimony Smoak would require any additional medical procedures in the future beyond mere possibilities. This does not meet the requirements for a judgment for future medical expenses. *See Pool,* 813 S.W.2d at 681. We therefore reverse and render judgment that Smoak take nothing regarding future medical care.

## VI. CONCLUSION

We reverse and render judgment that Smoak take nothing in regard to future medical care because there was no evidence of the reasonable probability for the need of such care. We affirm the judgment of the trial court in all other respects.