NUMBER 13-06-288-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


McALLEN HOSPITALS, L.P., ET AL., Appellants,


v.
 


CARMEN GARZA MUNIZ, ET AL., Appellees.

 


On appeal from the 206th District Court 


of Hidalgo County, Texas.


 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Rodriguez and Garza 


Memorandum Opinion by Justice Rodriguez



 Appellees, Carmen Garza Muniz, San Juana Muniz Perez, Arturo Muniz Garza,
and Sonia Sereno brought this action against appellants, McAllen Hospitals, L.P., and
McAllen Medical Center, Inc. d/b/a McAllen Medical Center (the Hospital), and Shahid
Rashid, M.D., to recover damages allegedly sustained as the result of medical
malpractice. (1) The jury returned a verdict in favor of Dr. Rashid but against the
Hospital. The trial court entered judgment on the jury verdict, and the Hospital filed
a timely notice of appeal. By its first two issues, the Hospital challenges the evidence
as legally and factually insufficient to support the jury's finding that any negligence by
the Hospital was a proximate cause of Mr. Muniz's death. By its third issue, the
Hospital contends the trial court erred when it denied the Hospital's motion to strike
or limit the causation testimony of Howard Rosner, M.D., appellants' expert. (2) We
affirm.

I. Background

 This is a medical malpractice case in which appellees claim negligent acts of
the Hospital caused the death of Mr. Muniz. Dr. Rosner, appellees' designated
expert, testified that Mr. Muniz's death was caused by the Hospital's failure to monitor
his condition while he was administered Dilaudid, an opiate. 

 Mr. Muniz's lower left leg was amputated at the Hospital on April 16, 2002. 
After the surgery, Mr. Muniz appeared to suffer from pain at the surgical site and from
"phantom pain." Mr. Muniz's pain was controlled through oral administration of
Darvocet. Dr. Rashid was consulted on pain management, and on April 20, 2002, Dr.
Rashid ordered, for Mr. Muniz, the use of a patient-control analgesia pump (PCA) to
deliver Dilaudid intravenously. (3) At about 8:00 p.m., Cesar Duque, L.V.N., initiated the
PCA to deliver Dilaudid. Following the initiation of the PCA, the amounts of Dilaudid
either administered or received by Mr. Muniz were never recorded. At 9:00 p.m., a
nurse took a blood sample from Mr. Muniz for a glucose check. At 10:54 p.m. that
same evening, Nurse Duque found Mr. Muniz with no pulse and no respirations. A
Code was called. The physician responding to the Code began the protocol for
advanced cardiac life support and, upon hooking Mr. Muniz up to the EKG, found him
to have pulseless electrical activity. The family agreed to stop resuscitation, and Mr.
Muniz was pronounced dead shortly thereafter. 

 Appellees sued the Hospital and Dr. Rashid for wrongful death, complaining 
that Dr. Rashid should not have ordered the Dilaudid and that the Hospital failed to
monitor Mr. Muniz; thus, causing his death. Dr. Rosner, appellees' expert witness on
causation, testified that Mr. Muniz died of cardio-respiratory arrest. Dr. Rosner further
testified, "Everybody dies when their heart stops beating and the lungs stop breathing,
and what we're doing here is looking for why his heart stopped beating and his lungs
stopped working and he stopped breathing." According to Dr. Rosner, Mr. Muniz died
from the sedating effects of Dilaudid. He stated:

 As he [a patient] gets more sedated, he takes in less oxygen and blows
off less carbon dioxide. . . . At some point along the way his carbon
dioxide concentration in his blood is going to be high enough to trigger
a fatal arrhythmia or his hypoxia is just going to stop his heart.

Dr. Rosner testified that had the Hospital monitored Mr. Muniz while on Dilaudid it
could have prevented his death. Thus, appellees alleged that the Hospital's
negligence in failing to monitor Mr. Muniz proximately caused his death.

 The Hospital challenged Dr. Rosner's testimony several times during trial. It
filed a motion for summary judgment and a motion to limit Dr. Rosner's testimony
before trial claiming that the testimony on causation was speculative and, pursuant
to rule of evidence 702, was neither relevant nor reliable. See Tex. R. Evid. 702. The
Hospital also filed a motion for directed verdict and objected to the charge on the
same grounds. The trial court denied each motion and objection. 

 The jury returned a verdict in favor of Dr. Rashid but against the Hospital. The
trial court entered judgment on the verdict. In this appeal, the Hospital does not
challenge the jury's finding that the Hospital was negligent in its monitoring of Mr.
Muniz. It challenges the jury's finding that the Hospital's negligent act was the
proximate cause of Mr. Muniz's death.

II. Admission of Expert Testimony

 In its third issue, the Hospital argues that the trial court erred when it denied its
motion to strike Dr. Rosner's testimony because his testimony was not reliable under
rule 702. Specifically, the Hospital argues that Dr. Rosner's testimony is based on
assumptions and not supported by a necessary and detailed explanation. We
disagree.

A. Standard of Review and Applicable Case Law

 If an expert's testimony would assist the fact finder in understanding the
evidence or determining a fact issue, that expert may testify on scientific, technical,
or other specialized subjects. Tex. R. Evid. 702; Mack Trucks v. Tamez, 206 S.W.3d
572, 578 (Tex. 2006). An expert's testimony is admissible if the expert is qualified,
and if the testimony is relevant and based on a reliable foundation. (4) Id. It is within the
trial court's discretion whether these requirements are satisfied. Broders v. Heise, 924
S.W.2d 148, 151 (Tex. 1996); E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d
549, 556, 558 (Tex. 1995). Therefore, we review the trial court's decision to admit an
expert's testimony under an abuse of discretion standard. Robinson, 923 S.W.2d at
558; Brandt v. Surber, 194 S.W.3d 108, 130 (Tex. App.--Corpus Christi 2006, pet.
denied). A trial court does not abuse its discretion merely because a reviewing court
in the same circumstances would have ruled differently. Robinson, 923 S.W.2d at
558; Downer v. Aquamarine Operations, Inc., 701 S.W.2d 238, 242 (Tex. 1985); Brandt,
194 S.W.3d at 130. The trial court abuses its discretion if its decision was arbitrary
or unreasonable without regard to guiding rules and principles. Downer, 701 S.W.2d
at 241-42; Brandt, 194 S.W.3d at 130. 

 To determine whether an expert's testimony is reliable, the trial court must
"evaluate the methods, analysis, and principles relied upon in reaching the opinion"
and "should ensure that the opinion comports with applicable professional standards
outside the courtroom." Gammill v. Jack Williams Chevrolet, 972 S.W.2d 713, 725-26
(Tex. 1998). The trial court must determine whether the expert's analysis used to
reach its conclusions is reliable not whether those conclusions are correct. Id. at 728.

 Scientific expert testimony is reliable if it is "grounded 'in the methods and
procedures of science' [otherwise it] is no more than 'subjective belief or unsupported
speculation.'" Robinson, 923 S.W.2d at 557 (quoting Daubert v. Merrill Dow Pharms.,
Inc., 509 U.S. 579, 590 (1993)). In Robinson, the supreme court identified six
nonexclusive factors to guide a trial court in determining whether expert testimony is
reliable. (5) Robinson, 923 S.W.2d at 557. However, these factors are not applicable
in some cases when "experience alone may provide a sufficient basis for an expert's
testimony." Gammill, 972 S.W.2d at 726. In these cases, a trial court may exclude
an expert's opinion as unreliable if there is "simply too great an analytical gap
between the data and the opinion proffered." Id. (quoting Gen. Elec. Co. v. Joiner, 522
U.S. 136, 146 (1997). An impermissible analytical gap exists if an expert "has offered
nothing to suggest that what he believes could have happened actually did happen"
because then "[h]is opinions are little more than 'subjective belief or unsupported
speculation.'" Id. at 727-28 (citing Robinson, 923 S.W.2d at 557). The critical inquiry
is whether there is an "analytical gap" between the opinion and the basis on which it
is founded. Id. at 726. The proponent of the expert testimony bears the burden of
demonstrating its expert is qualified under rule 702. Robinson, 923 S.W.2d at 557. B. Analysis

 Through affidavit, expert written report, and oral deposition, Dr. Rosner
expressed that Mr. Muniz's death was proximately caused by the failure of the
Hospital staff to monitor Mr. Muniz's vital signs, oxygen saturation, and level of
consciousness after the PCA administration of the drug, Dilaudid. Dr. Rosner based
his opinion on his review of Mr. Muniz's medical records, death certificate, clinical
condition, prior opiate sensitivity, and co-morbidities, which are other associated
medical illnesses. In his opinion, Dr Rosner concluded that Mr. Muniz's co-morbidities
of congestive heart failure (CHF), coronary artery disease (CAD), and chronic
obstructive pulmonary disease (COPD) caused him to have less reserve and be more
susceptible to sedation and respiratory depression. 

 In a sworn affidavit attached to appellees' response to the Hospital's motion to
strike his testimony, Dr. Rosner stated that based on his review of these records, (1)
Dr. Rashid prescribed and Mr. Muniz was administered Dilaudid PCA on April 20,
2002, (2) the prescribed dosage of Dilaudid given intravenously at a basal rate of 0.5
mg/hr and a demand dose of .025 mg every 15 minutes as needed was an
equipotent (6)
 dose higher than any opiate that Mr. Muniz had been exposed to before,
(3) Mr. Muniz was found non-responsive with no respirations or pulse at 10:54 p.m.,
less than three hours after the administration of Dilaudid. Dr. Rosner opined that the
cause of death was acute opiate intoxication. He based this opinion on his review of
Mr. Muniz's medical record, and on his training, experience, and education as an
anesthesiologist specializing in pain management.

 Further, in his written report, dated March 23, 2004, Dr. Rosner stated that prior
to the administration of Dilaudid through PCA the following occurred: 

 For the operative pain he [Mr. Muniz] was started on a PCA with
morphine late in the day on 4/16 at a basal rate of 1 mg/hr and a
demand dose of 1 mg every 15 minutes as needed for pain. . . . At
06:30 the following morning, after significant changes in mental status
and an episode of mild hypotension was noted in the nursing notes, the
PCA was stopped and he was treated with Darvocet N-100 one tab
every 3 hours as needed for his postoperative pain. . . . [T]he nursing
notes indicated he was relieved of his discomfort with the use of
Darvocet.


 During Dr. Rosner's deposition, opposing counsel asked him on what he based
his opinion that Mr. Muniz died from opiate intoxication. Dr. Rosner answered that,
in his opinion, Mr. Muniz was an opiate sensitive patient. 

 I [Dr. Rosner] interpret that [termination of morphine due to mental
status change] as a sort of indication that this is a patient who is opiate
sensitive. . . . I am struck by a patient who has manifested sensitivity to
opiate in two ways: One, that he developed mental status change to
morphine; and two that he had a decent effect to Darvocet. He's then
given a very potent opiate intravenously at a dose higher than anything
that he had been exposed to before. Several hours later he is dead. In
my mind, the sequence of events is fairly clear, and that is that over the
course of a few hours, he became sedated from the opiate. His
respiratory rate dropped. He already had difficulty in blowing off carbon
dioxide because of his pre-existing emphysema, so he developed an
increasing blood level of carbon dioxide. This deepens his sedation to
the point that the carbon dioxide in the blood starts causing cardiac
arrhythmia, and it doesn't take very long for that to translate to
something that is fatal. It is not only a very plausible sequence of
events, it's a very probable sequence of events.


 In his written report, Dr. Rosner explained that the equipotent doses of Dilaudid
to morphine are 5-7:1. 

 That is to say, Dilaudid is five to seven times the potency as morphine. 
Therefore, the morphine equivalents of the Dilaudid PCA doses are:
basal rate 2.5 3.5 mg/hr, and demand dose of 1.25-1.75 mg every 15
minutes as needed. . . . It is my opinion, based on reasonable medical
probability, that the cause of death for Mr. Muniz was acute opiate
intoxication. . . . [C]loser monitoring of the patient would most likely
have prevented such a dramatic complication.


He then explained that with proper monitoring, the effects of an opiate overdose is
"easily reversed using naloxone or any other opiate antagonist, if it is given in a timely
fashion."

 Because Dr. Rosner's opinion is based largely on his experience, the trial court
may have applied Gammill's analytical gap test to evaluate its reliability. See Gammill,
972 S.W.2d at 724-25; see also Mack Trucks, 206 S.W.3d at 579 ("We recognized [in
Gammill] that the criteria for assessing reliability must vary depending on the nature
of the evidence."). Dr. Rosner's analysis of the medical records involves the
application of scientific principles, but he does not rely on scientific study or theory to
form his opinions. Instead, he considered Mr. Muniz's medical records, death
certificate, clinical condition, prior opiate sensitivity, and co-morbidities to conclude
the proximate cause of his death. This methodology is not easily tested by objective
criteria, such as those identified in Robinson and Daubert; however, the trial court was
still required to evaluate the reliability of Dr. Rosner's testimony. See Mack Trucks,
206 S.W.3d at 579 ("A significant part of the trial court's gatekeeper function is to
evaluate the expert's qualifications, listen to the testimony, view the evidence, and
determine which factors and evaluation methodology are most appropriate to apply.").

 In this case, Dr. Rosner relied on objective criteria in the record and his own
experience to conclude in his sworn affidavit that the Hospital's failure to monitor Mr.
Muniz was the proximate cause of death. While the Hospital may disagree with Dr.
Rosner's conclusions, he explained the basis for his opinions. The critical inquiry is
whether there is an "analytical gap" between Dr. Rosner's opinion and his
interpretation of the data he reviewed on which he founded that opinion. See Gammill,
972 S.W.2d at 726. In this case, using the analytical-gap analysis, the trial court
could have concluded Dr. Rosner's medical experience and knowledge, and his
explanation of the basis for his opinions, demonstrates that his testimony is reliable. 
See id.

 Moreover, both the Hospital's expert witness, Victor Pallares, M.D., and Dr.
Rosner based their opinions on the same objective data contained in Mr. Muniz's
medical records. And, although Dr. Rosner and Dr. Pallares reviewed the same
records, they differed in their interpretations of what was contained therein. Dr.
Pallares testified that, based on his review of Mr. Muniz's medical records, Mr. Muniz
probably died from a pre-existing heart condition and not from opiate intoxication. 
These differences in opinion did not result from the application of any flawed
methodology, but from their "differing conclusions as to the underlying factual
situation." See Brandt, 194 S.W.3d at 132.

 Therefore, because the trial court followed guiding rules and principles and its
decision was not arbitrary or unreasonable, we conclude that the trial court did not
abuse its discretion in admitting the expert testimony of Dr. Rosner. See Downer, 701
S.W.2d at 241-42. Accordingly, we overrule the Hospital's third issue.

III. Sufficiency of Evidence to Establish 

Proximate Cause


 By its first two issues, the Hospital challenges the legal and factual sufficiency
of the evidence on the issue of proximate cause. In addition, the Hospital claims Dr.
Rosner used the term "assumptions" when he gave his opinion and his "assumptions"
cannot support the verdict in this case.

A. Standards of Review

 In determining whether there is legally sufficient evidence to support the
finding, we must "view the evidence in the light most favorable to the verdict, crediting
favorable evidence if reasonable jurors could, and disregarding contrary evidence
unless reasonable jurors could not." City of Keller v. Wilson, 168 S.W.3d 802, 827
(Tex. 2005). A legal sufficiency challenge may be sustained only when (1) the record
discloses a complete absence of evidence of a vital fact, (2) the court is barred by
rules of law or of evidence from giving weight to the only evidence offered to prove
a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere
scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. Id.
at 810. If more than a scintilla of evidence supports the finding, the no-evidence
challenge fails and the finding is legally sufficient. Lee Lewis Constr., Inc. v. Harrison,
70 S.W.3d 778, 782 (Tex. 2001). "More than a scintilla of evidence exists if the
evidence furnishes some reasonable basis for differing conclusions by reasonable
minds about a vital fact's existence." Certain Underwriters at Lloyd's v. KKM Inc., 215
S.W.3d 486, 493-94 (Tex. App.--Corpus Christi 2006, pet. denied) (citing Lee Lewis
Constr., 70 S.W.3d at 782-83). However, the evidence is no more than a scintilla
when the evidence is so weak as to do no more than create a mere surmise or
suspicion of a fact. Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004).

 When reviewing the factual sufficiency of the evidence, we consider and weigh
all of the evidence which supports or undermines the jury's finding. Maritime Overseas
Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998); Plas-Tex, Inc. v. U.S. Steel Corp.,
772 S.W.2d 442, 445 (Tex. 1989). We will set aside the verdict only if it is "so against
the great weight and preponderance of the evidence as to be clearly wrong and
unjust." Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam) (citing Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)). The jury is the sole judge of the
credibility of witnesses and the weight to be given to their testimony, and we may not
substitute our judgment for theirs. Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d
757, 761 (Tex. 2003); Ellis, 971 S.W.2d at 407.

B. Applicable Law

 To establish proximate cause, the plaintiff must prove (1) foreseeability, and (2)
cause-in-fact. Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996). In cases involving
medical negligence, cause-in-fact requires that the plaintiffs prove "by a
preponderance of the evidence, the negligent act or omission is shown to be a
substantial factor in bringing about the harm, and without which the harm would not
have occurred." Park Place Hosp. v. Estate of Milo, 909 S.W.2d 508, 511 (Tex. 1995). 
The plaintiff must establish a causal connection between the defendant's negligence
and the injuries based upon a reasonable medical probability. Id. 

 The trier of fact may decide the issue of proximate cause in medical
malpractice cases based upon: (1) general experience and common sense from
which reasonable persons can determine causation; (2) scientific principles provided
by expert testimony allowing the fact finder to establish a traceable chain of causation
from the condition back to the event; or (3) a probable causal relationship as
articulated by expert testimony. Lenger v. Physician's Gen. Hosp., Inc., 455 S.W.2d
703, 706 (Tex. 1970); Parker v. Employers Mut. Liab. Ins. Co. of Wis., 440 S.W.2d 43,
46 (Tex. 1969); Pilgrim's Pride Corp. v. Smoak, 134 S.W.3d 880, 889 (Tex.
App.--Texarkana 2004, pet. denied).

 Expert testimony on a causal connection rests upon reasonable medical
probability that must be determined by the substance and context of the testimony
rather than semantics or use of a particular term or phrase. Burroughs Wellcome Co.
v. Crye, 907 S.W.2d 497, 499-500 (Tex. 1995). An expert's opinion is without
probative value and cannot support a verdict or judgment when it is based on
assumed facts that vary materially from the actual, undisputed facts. Id. at 500.

C. Analysis

 In this case, expert medical testimony based on reasonable probability was
required to establish either a "traceable chain of causation" based upon general
scientific principles or a "probable causal relationship" between the Hospital's failure
to monitor Mr. Muniz and his death. See Park Place Hosp., 909 S.W.2d at 511;
Arlington Mem'l Hosp. Found., Inc. v. Baird, 991 S.W.2d 918, 922 (Tex. App.--Fort
Worth 1999, pet. denied); Bradley v. Rogers, 879 S.W.2d 947, 953-54 (Tex.
App.--Houston [14th Dist.] 1994, writ denied). Specifically, appellees' burden was
to establish, through expert testimony, that there was a reasonable medical
probability that the Hospital's failure to monitor Mr. Muniz, while on Dilaudid, was a
substantial factor in bringing about his death and without which the harm would not
have occurred. See Park Place Hosp., 909 S.W.2d at 511; Crye, 907 S.W.2d at 500. 

 The Hospital asserts that Dr. Rosner's conclusion that the Dilaudid caused
respiratory distress, resulting in less oxygen but more carbon dioxide in the body, and
thereby leading to a fatal heart arrhythmia, was based on assumptions. However, we
have concluded above that Dr. Rosner's testimony was reliable and based on his
experience and objective criteria in the record rather than on assumptions. See
Gammill, 972 S.W.2d at 726; see also Crye, 907 S.W.2d at 500.

 Further, the Hospital argues appellees did not meet their burden because there
is not sufficient evidence in the record that: (1) Mr. Muniz suffered from respiratory
depression after he received the Dilaudid; (2) the fatal heart arrhythmia was caused
by the respiratory depression; and (3) sufficient monitoring by the Hospital would have
prevented the death. Appellees argue that their burden at trial was to prove cause-in-fact, i.e., that the Hospital's negligence was a substantial factor in bringing about Mr.
Muniz's death, and without which Mr. Muniz would have lived. We agree with
appellees. The jury charge states: 

 'Proximate Cause,' when used with respect to the conduct of MCALLEN
HOSPITALS, L.P., D/B/A MCALLEN MEDICAL CENTER, means that
cause which, in a natural and continuous sequence, produces an event,
and without which cause such event would not have occurred. In order
to be a proximate cause, the act or omission complained of must be
such that a hospital using ordinary care would have foreseen that event,
or some similar event, might reasonably result therefrom. There may be
more than one proximate cause of an event.


 On direct examination, Dr. Rosner testified as follows: 

 At the end of the day, all of us die of cardio respiratory failure. . . . That's
not causation. . . . In order for us to function physiologically, we--our
lungs do two things: We take in air, we pull the oxygen out of the air so
that it circulates throughout our body and gets to the muscles and
nerves and the brain; and at the same time, the lung gives back to the
lungs carbon dioxide so we blow it off. And we exist in this balance. If
we don't have enough oxygen, our tissues become what's called
ischemic and that means they start to disfunction. And it can be the
brain, it can be the heart. All tissues require a certain amount of oxygen
in order to function. As oxygen levels drop, people become sedated. As
we--if we're not blowing off carbon dioxide and carbon dioxide levels
rise, the heart starts developing very bizarre rhythms and ultimately can
result in a fatal rhythm. And I believe that that was what occurred in this
situation.


Dr. Rosner continued with the following:

 

 Q: But is it your opinion that the only thing that is probable is this
[Dilaudid caused Mr. Muniz's death]?

 

 A: In my opinion, it is the major variable. That was the one thing that
changed in the presence of everything else being constant and,
therefore, that remains my opinion as the most probable reason
for his demise at that point in time.


 Q: And that's what you--we refer to in regard to the sequence of
events, right?

 

 A: Yes.

 

 Q: Could you just explain that. What--explain the sequence of
events or the thing that was added that leads you to believe that
Dilaudid is the probable cause and that the COPD, CHF,
cardiomyopathy, coronary artery disease, atrial fibrillation and
carotid artery are in the possible category.


 A: Well, the same treatment for the surgery--surgically deep vein
thrombosis is the same treatment as one would receive to prevent
atrial thrombosis, which is Coumadin. So if the patient is on
Coumadin, then he's being treated to prevent the development of
clots. It doesn't matter where, whether it's in the heart or in the
deep veins. Same blood, same clot. What--when I reviewed the
chart, what I was struck by was looking at a patient who was
manifesting benefit on a regular basis from a fairly weak opiate,
who had manifested what I consider to be an opiate induced side
effect, and that is sedation, from his previous therapy or morphine
at a time that was closer to the surgical trauma than we're dealing
with now. So he had morphine day of surgery and day after
surgery and he had a side effect to the dose of one milligram an
hour infusion. Four days later he has less pain, his pain is being
controlled intermittently by a weak opiate. We then take a strong
opiate, put him on an infusion that is two and a half to three and
a half times the dose that he had received immediately after
surgery to which he already had a side effect, we know that. So
if he has a side effect to something and we give him something
four days later when he has less stimulus, that's stronger, I think
that that's--that started the sequence of events. So now he's on
an infusion. He has minimal stimulus, he gets progressively more
sedated. Somebody comes in and does a finger stick, he wakes
up. He's stimulated. As soon as the stimulus is gone, he goes
back to sleep. And the sequence of events continues that he gets
progressively more sedated. I mean, that--that much itself is
evident. It's in the chart. He's getting the drug. As he gets more
sedated, he takes in less oxygen and blows off less carbon
dioxide. I don't need the chart to tell me that. Hundreds of years
of physiology tells us that that's what happens. That's what
opiates do. At some point along the way his carbon dioxide
concentration in his blood is going to be high enough to trigger a
fatal arrhythmia, or his hypoxia is just going to stop his heart.


Dr. Rosner also testified as to the Hospital's role and why its negligence was the
proximate cause of Mr. Muniz's death during the following:

 Q: Dr. Rosner, is there anything that could have saved Mr. Muniz
after he had been put on this continuous rate of Dilaudid on the
evening of the 20th?

 

 A: Certainly.

 

 Q: What's that?

 

 A: Well, number one would be to observe the sedation, observe the
slowed respiratory rate and stop the infusion. Beyond that, these
drugs are easily reversed with intravenous agent such as
Naloxone which is readily available in Hospitals. Oftentimes just
shaking somebody and keeping them awake is enough until the
drug is available to reverse the effects.

 

 Q: Okay. When you say that observation of sedation, respiratory
rate and stopping the infusion and giving these agents could have
prevented this death, is--whose responsibility is that?

 

 A: It's a nursing function.

 

 . . . . 


 Q: Okay. So based upon reasonable medical probability, what
happened after that [a nurse took a blood sample from Mr. Muniz
at 9:00 p.m. after the Dilaudid was administered]

 

 A: Once the stimulation of the finger stick for blood sugar was over
and the pump continued to run, continued to get this sedating,
respiratorily depressing drug that he didn't need because he didn't
have pain, he just went further and further to sleep, deeper and
deeper. And had, at that period of time someone come in and
checked even respiratory rate, how many times a minute is he
breathing, then I think this situation could have been averted.


 Basing his opinion on the same medical records Dr. Rosner reviewed, Dr.
Pallares, the Hospital's expert, testified that Mr. Muniz was not an opiate sensitive
patient. He believed that Mr. Muniz did not suffer an adverse reaction to the
morphine. Dr. Pallares stated:

 In establishing protocols and dealing with acute pain management for so
many years, the hospital that I trained at, we would see 50 of these PCA
patients a day. And we had routine doses of morphine where patients
were getting, over a period of four hours, up to 30 milligrams, over four
hours of morphine, patients who were--had multiple medical conditions,
very critical and really would not have any effects from that dose of
medication which is higher than this PCA was set at.


Dr. Pallares testified that when a patient is on a strong opiate such as morphine, the
"main concern . . . is respiratory rate. You're concerned about making sure that their
breathing is not depressed." He continued by explaining that Mr. Muniz's respiratory
rate "maintained normal throughout the time the PCA" was used to administer the
morphine to Mr. Muniz. Dr. Pallares then explained what he would look for in
determining whether Mr. Muniz suffered an adverse reaction to Dilaudid. "[O]ne of
the first things I would be concerned about is respiratory rate suppression." When
asked why it would be important for a nurse to check Mr. Muniz's mental and
neurological status while on Dilaudid he answered:

 Well, if--if someone is on a . . . Dilaudid and is getting basal rate of
Dilaudid and has the option of pressing the button to get more, you want
to make sure that the patient is not overly sleepy or sedated. And you
also--or not slurred speech or unresponsive. And you also want to
make sure that the patient has a respiratory rate and other vital signs
that are stable. And if this was started at 8:00 and 30 minutes later it
was checked, I think that's an appropriate timing to--make sure that
those respirations and the patient's mental status is--is appropriate.


Dr. Pallares then testified that based on his review of the records, he believed that
one of Mr. Muniz's other medical conditions "could have precipitated his death" and
"not the fact that he had a--a method of PCA for controlling his pain." During cross-examination Dr. Pallares clarified that after examining the data in this case it was his
opinion that "it's probable that his [Mr. Muniz] cause of death was related to his
cardiac condition in one--form or another."

 After considering evidence favorable to the finding that a reasonable fact-finder
could and disregarding evidence contrary to the finding a reasonable fact-finder could
not, we conclude the evidence offered to prove cause-in-fact is legally sufficient. See
City of Keller, 168 S.W.3d at 827. The evidence does more than create a mere
surmise or suspicion that the Hospital's failure to monitor Mr. Muniz was a substantial
factor in bringing about his death, and without which his death would not have
occurred. See Ford Motor Co., 135 S.W.3d at 601. We, therefore, conclude the
evidence is legally sufficient to support the jury's finding that any negligence by the
Hospital was a proximate cause of Mr. Muniz's death. Accordingly, we overrule the
Hospital's first issue.

 Furthermore, after considering and weighing all of the evidence, we conclude
it is not so against the great weight and preponderance of the evidence as to be
clearly wrong and unjust. See Ellis, 971 S.W.2d at 406-07; Plas-Tex, Inc., 772 S.W.2d
at 445; Ortiz, 917 S.W.2d at 772. As the sole judge of the credibility of witnesses and
the weight to be given to their testimony, the jury was able to believe Dr. Rosner's
testimony that Mr. Muniz died from opiate intoxication and that the Hospital's
negligence caused his death. See Golden Eagle Archery, Inc., 116 S.W.3d at 761;
Ellis, 971 S.W.2d at 407. Therefore, we conclude that the evidence is factually
sufficient to support the jury's finding that any negligence by the Hospital was a
proximate cause of Mr. Muniz's death. We overrule the Hospital's second issue.

IV. Conclusion

 We affirm the trial court's judgment.

 

 NELDA V. RODRIGUEZ

 Justice


Memorandum Opinion delivered and 

filed this 13th day of December, 2007.

1. Appellees are the surviving wife and children of Lazaro Muniz, who died at the Hospital on
April 20, 2002.
2. We must first decide whether Dr. Rosner's testimony is admissible before we can consider
the legal and factual sufficiency of the evidence.
3. According to Dr. Rosner, a PCA delivers a pre-set dose of the drug continuously at the basal
rate and also allows the patient to give himself a prescribed dosage of a booster of the drug when
needed.
4. The Hospital does not challenge Dr. Rosner's qualifications or the relevancy of his testimony
on appeal. The Hospital only complains that Dr. Rosner's testimony is unreliable under rule 702. See
Tex. R. Evid. 702.
5. The nonexclusive Robinson factors include: (1) the extent to which the theory has been or can
be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert;
(3) whether the theory has been subjected to peer review and/or publication; (4) the technique's
potential rate of error; (5) whether the underlying theory or technique has been generally accepted as
valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the
theory or technique. E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995). 
6. "Equipotent" is defined as "having equal effects or capacities." Merriam-Webster On-Line
Dictionary, available at http://medical.merriam-webster.com/medical/equipotent (last visited November
29, 2007).